UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 4:11CR451 JAR |
| JAMES FRANCE, | ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

The above matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. §636(b). The Defendant filed a motion to suppress statements, a motion to suppress physical evidence, and a motion to dismiss indictment. The undersigned held a hearing on the Defendant's motions on October 24, 2012. At the hearing in this matter, the Defendant announced that he was moving to withdraw his previously filed motion to suppress physical evidence, and would proceed on the motion to suppress statements and the motion to dismiss the indictment. Further, after the hearing, a transcript of the proceedings was prepared and the undersigned entered a briefing schedule directing that the Defendant file a post-hearing brief no later than November 13, 2012, and any response by the Government no later than November 20, 2012. In addition, on October 26, 2012, the Defendant filed a written motion to withdraw the motion to suppress physical evidence.

### [ECF No. 58] Defendant's Motion to Dismiss Indictment for Insufficiency and Failure to State an Offense

The Defendant moves to dismiss the indictment because he alleges that the Government failed to state an offense in sufficient detail, and failed to inform him of the charges against him in sufficient

detail. The Defendant essentially claims that the indictment is so vague and non-specific as to not charge him with an offense against the United States. According to Rule 7(c), Federal Rules of Criminal Procedure, an indictment or information must be a plain, concise, and definite statement of the essential facts constituting the offense charged, and must be signed by an attorney for the government. It need not contain a formal introduction or conclusion, and an allegation in one count may be incorporated by reference in another count. Further, the indictment may allege that the means by which a defendant committed an offense are unknown, or it may specify the means. Thus, the rules as to sufficiency of an indictment are general, and allow for non-specific but factual pleading of the offenses charged. Generally, an indictment valid on its face is immune from attack. See Costello v. United States, 350 U.S. 359 (1956). Further, an indictment is sufficient if it contains all of the essential elements of the offense charged, and fairly informs the defendant of the charge against him in sufficient detail so that the defendant might plead a conviction or acquittal as a bar to a subsequent prosecution. Further, an indictment will normally be sufficient unless it is so defective that it can not be construed by any means to charge an offense against the defendant. See United States v. Huggans, 650 F.3d 1210 (8th Cir. 2011); United States v. Hayes, 574 F.3d 460 (8th Cir. 2009). See also Hamling v. United States, 418 U.S. 87 (1974).

Given the above standards, the undersigned concludes that the indictment in this case is more than ample to charge an offense against the United States. First, the indictment alleges wire fraud, and states that the overall scheme is a scheme to obtain money from persons by inducing them to pay the Defendant substantial monetary fees by falsely representing that he had the ability to provide or obtain financing for their commercial projects. Thus, the indictment charges the Defendant with an advance-fee swindle, and alleges that he represented to people that he could obtain their financing,

when, in fact, he could not and did not obtain financing for them. Thus, he is put on notice of the essential nature of the fraud. In addition, it is alleged that Mr. France induced payment of the advance fee by stating that it would be used to cover his expenses for securing funding for his client's project when, in fact, he used the client's money for other purposes unrelated to the client's project which included, according to the indictment, his own salary, and money for his own personal use. Further, the indictment alleges four specific instances in which these false statements were made to individual clients in return for their advance fee or money. Whether the Government can prove this or how they prove it is for trial, and is not the proper subject of a motion to dismiss. See United States v. Nabors, 45 F.3d 328 (8th Cir. 1995).

Therefore, the undersigned concludes that the indictment contains all of the essential elements and adequately charges an offense against the United States.

Therefore, based on the above, the undersigned concludes that the Defendant's motion to dismiss should be denied.

### [ECF No. 56] Defendant's Motion to Suppress Statements

Based upon the evidence adduced at the hearing in this matter, a review of the transcript of the hearing as well as the post-hearing brief, the undersigned makes the following findings of fact and conclusions of law:

**Findings of Fact**

Peyton Tucker is an FBI agent. He is the case agent on the James France case. He was investigating France as a possible defendant in an advance-fee swindle.

On about January 18, 2011, Tucker attempted to contact the Defendant to interview him. When Tucker could not find him immediately, he left his card with the Defendant's wife, and asked

that the Defendant call him. France called Tucker in response to this, and Tucker tried to make arrangements to talk to France. The Defendant told Tucker that he was no longer living in the St. Louis area, but was staying with his father-in-law in Newport News, Virginia. He told Tucker he would be returning to St. Louis, and they could talk at that time. Shortly after this, the Defendant called Tucker again and told him he would be staying in Virginia for an extended period of time. Tucker asked the Defendant if he could come to Virginia to interview him at that location, and the Defendant said that was all right with him. The Defendant eventually told Tucker that he could interview him at his residence in Newport News, Virginia, which was at his father-in-law's house. The Defendant told Tucker he could come to the house on February 9, 2011 and interview him.

On February 9, 2011, at about 10 a.m., Tucker and another agent from the Newport News office arrived for the interview. The Defendant answered the door and invited the agents to enter. He introduced the agents to his father-in-law, and then took the agents to a finished area in the basement. The agents conducted the interview in this location. The interview lasted for about three to four hours. No threats or promises were made to the Defendant during the interview, and the interview was evidently quite cordial. According to Tucker, the Defendant was very calm during the interview, and did not display any excess emotion. He answered all questions in a rational--not an emotional--manner. The Defendant also told Tucker that his wife had left him, and he suffered a mental breakdown. Tucker did not pursue this any further with the Defendant. During the interview, Tucker noticed that the Defendant did tell him things that he believed were not true, such as that Donald Trump was his business partner, but Tucker did not consider this to be bizarre. It appeared to Tucker to be an exaggeration to make the Defendant look more important than actually was the case.

4

During the interview, the Defendant explained to Tucker the manner in which he conducted his business dealings with other individuals. He told the agent, "If that is a crime, then I did it." Tucker told the Defendant he believed what he did was a crime, however, he never told the Defendant he could or would go to jail for this crime. During the interview, the Defendant went to the bathroom, and Defendant's movement was not restricted in any way in his own house. At the end of the interview, the agents left the house, as they evidently had no intention of arresting the Defendant on that date.

The Defendant's daughter testified that he was under a great deal of stress toward the end of the year 2010 and the beginning of 2011. The Defendant's wife had left him, and he was in financial difficulty. The daughter testified that the Defendant was highly emotional, not eating, not sleeping, and not making rational decisions. According to the daughter, he was suffering from depression and panic attacks. In November and December, he went to a doctor, and received medications for depression and anxiety, and, according to the daughter, his condition improved somewhat. During a visit to the doctor in November, 2010, the doctor noted in the file that the Defendant's memory, his affect, and his judgment were normal.

**Conclusions of Law**

Custody:

Based on the above findings of fact, the undersigned concludes that the Defendant was not in custody at the time of his interview in Virginia or any of his telephone conversations with Tucker. In United States v. Axsom, 289 F.3d 496 (8th Cir. 2002), the Court defined custody. The Court first stated that custody occurs when a suspect is deprived of his freedom of action in any significant way. In specifically defining custody in Axsom, supra, the Court stated as follows:

5

> In deciding whether a person was "in custody," we must examine both the presence and extent of physical and psychological restraints placed upon the person's liberty during interrogation "in light of whether a 'reasonable person in the suspect's position would have understood his situation' to be one of custody." Griffin, 922 F.2d at 1347 (quoting Berkemer, 468 at 442, 104 S.Ct. 3138). Thus, if Axsom believed his freedom of action had been restrained to a "degree associated with formal arrest" and his "belief was reasonable from an objective viewpoint," then Axsom was "held in custody during the interrogation." Id. at 1347 (citations omitted).

United States v. Axsom, 289 F.3d 496, 500 (8th Cir. 2002).

In the above case, agents executed a search warrant at Axsom's home at 6:45 a.m., seeking evidence of child pornography. Axsom answered the door wearing only a towel, and nine federal agents entered his home. Several weapons were in the home, and the agents secured these weapons. Agents then escorted Axsom to his bedroom to dress. Agents interviewed Axsom in his living room without informing him that the questioning was voluntary, and without giving him a Miranda warning. During the interview, Axsom was not allowed to get up and get himself a glass of water, and an agent escorted him to the bathroom. Nevertheless, the Court found the defendant not to be in custody for purposes of being given his Miranda warnings. In doing so, the Court relied heavily on the fact that the Defendant was in his own home during the statement, and also that his interview involved only two agents, rather than the other seven who were, at the time, executing the search warrant. In holding that the Defendant was not in custody, the Court stated as follows:

> While nine persons participated in the execution of a search warrant, only two agents conducted the interview. During the interview, Axsom sat on an easy chair and smoked his pipe while Hill and Mensinger sat across from him on a small sofa. Communication between the agents and Axsom consisted of two-way questioning. The agents asked questions of Axsom, but Axsom also asked the agents questions about search procedures. . .When a suspect is interrogated in the comfort and familiarity of his home, a court is less likely to find the circumstances custodial... We, therefore, find the district court erred in finding the presence of the fifth indicium or second aggravating factor.

6

> While execution of the search warrant was certainly police-dominated, the interview between the two agents and Axsom was not. The record contained no evidence of coercive or deceptive conduct by the agents during questioning. Axsom was not arrested after the questioning. Finally, the record establishes no other aggravating circumstances.

289 F.3d 496, 502, 503.

In the case now at bar, there is little evidence that the Defendant was in custody, particularly when compared to Axsom, supra. The agents were at the Defendant's house, after having specifically made an appointment with the Defendant to talk to him about his criminal behavior; the interview took place in the Defendant's own home, at a location in the home selected by the Defendant; the Defendant was free to move around his own home unescorted, and could go to the bathroom or obtain a drink of water; no threats or promises were made to the Defendant during the interview; the agents evidently had no intention of arresting the Defendant, and left his house after the interview was concluded. Based on all of the above, the undersigned concludes that the Defendant, as in Axsom, supra, was not in custody at the time of his interview with Agent Tucker. The undersigned concludes that a reasonable person would not believe that he was "under formal arrest" having invited the agents into his home and agreeing to talk to them. The undersigned also concludes that the Defendant was not in custody at the times that he contacted Agent Tucker by telephone. Further, an individual who is not in custody need not be given Miranda warnings in order for that person's statement to be admissible at trial. See Beckwith v. United States, 425 U.S. 341 (1976).

The undersigned also concludes that the Defendant's statements to Agent Tucker were voluntarily made, and not the product of coercion. To determine if the Defendant's statements were voluntary or involuntary, the Court must ask whether, in the light of the totality of the circumstances, law enforcement officials obtained the evidence by overbearing the free will of the accused, or

whether the accused made the statement based on his own free will. This inquiry centers upon 1) the conduct of law enforcement officials in creating pressure, and 2) the suspect's capacity to resist the pressure. In Colorado v. Connelly, 479 U.S. 157 (1986), the Supreme Court emphasized that coercion by a state actor is a necessary element to satisfy this test. In Connelly, the defendant, who was later diagnosed with paranoid schizophrenia and was apparently mentally ill at the time of his confession, approached the police officer, and stated that he wanted to talk to him. During this conversation with the police officer, the defendant confessed to a murder. The Court held that despite testimony that the defendant's mental illness interfered with his free will, and particularly his ability to resist any questioning, there was no evidence of coercion on the part of the police officer. The Court noted that:

> Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law.

479 U.S. 157, 164.

Further, in United States v. Gaddy, 532 F.3d 783 (8th Cir. 2008), the evidence showed that, just prior to the defendant's confession, he had been awake for several hours, and had ingested methamphetamine. In addition, just prior to the statement, police officers had entered his home at 5:30 a.m. using flash grenades, bright lights, swift entry, and loud noises to confuse and disorient the residents in order to ensure the officers' safe entry.

The Court, despite the fact that the defendant had used drugs and not slept and was perhaps somewhat disoriented by the entry, held that the confession was voluntary, and that the defendant's free will was not overborne. In so holding, the Court stated as follows:

> Sleeplessness, alcohol use and drug use are relevant to our analysis, but "[i]ntoxication and fatigue do not automatically render a confession involuntary."

8

> ...Instead, "the test is whether these mental impairments caused the defendant's will to be overborne."...Similarly, we have upheld the district court's conclusion that a suspect who used methamphetamine the evening before and marijuana the day he waived his rights consented voluntarily because police officers testified that he appeared "sober and in control of his facilities." ...Deputy Powell and Agent Peasley each testified that Gaddy appeared awake and coherent, and Gaddy did not tell them that he was tired, intoxicated or under the influence of drugs...
>
> The evidence also supports finding that Gaddy was not confused or disoriented... Deputy Powell testified that Gaddy looked "calm, fairly quiet" and was "very compliant" after the STAR team left. Agent Peasley testified that Gaddy understood his *Miranda* rights, agreed to waive them and appeared "cooperative" and "calm."...
>
> Based on the totality of the circumstances, the district court did not err in refusing to suppress Gaddy's confession because its findings that his will was not overborne is not clearly erroneous and the waiver of *Miranda* rights was voluntary.

See United States v. Gaddy, 532 F.3d 783, 788, 789.

Based on the above law, the undersigned concludes that the Defendant's confession was voluntarily made. Although the Defendant's daughter stated the Defendant was under a great deal of stress and not making rational decisions, and suffering from depression and panic attacks, Agent Tucker observed the Defendant, and said that the Defendant answered all of his questions in a rational manner. He further testified that the Defendant's responses to questions were not bizarre or grandiose, and in his opinion, the Defendant remained calm and very cooperative throughout the interview. Tucker testified that he made no threats or promises to the Defendant, and the interview was quite cordial.

Although the interview lasted for a little more than three hours, the starting time of 10 a.m. as well as the location of the interview, were selected by the Defendant. In addition, Tucker did not tell the Defendant that he had to talk to him, but merely requested the interview, which the Defendant granted. Further, the Defendant was allowed to go to the bathroom, and otherwise had free access to any parts of the house which he desired to go to unescorted by the agents. Although the

Defendant evidently was suffering from depression or panic attacks, during the Defendant's last visit to the doctor (which was prior to Tucker's interview) the doctor's file shows that the Defendant's memory, affect, and judgment were normal. Therefore, based on all of the above, the undersigned concludes that the statements were the product of the Defendant's free will, and, thus, voluntarily made.

## Conclusion

Therefore, the Defendant's statements should not be suppressed.

\* \* \*

In accordance with the Memorandum above,

**IT IS HEREBY ORDERED** that Defendant's Motion to Withdraw his Previously Filed Motion to Suppress Physical Evidence [ECF No. 68] be **granted**.

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Statements [ECF No. 56] and Defendant's Motion to Dismiss Indictment for Insufficiency and Failure to State an Offense [ECF No. 58] be **denied**.

Finally, the parties are advised that they have fourteen (14) days, in which to file written objections to this recommendation and determination. Failure to timely file objections may result in waiver of the right to appeal questions of fact. Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

          /s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this  10th  day of December, 2012.